IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

Debra K. Frakes,               )
                               )
         Plaintiff,            )
                               )
     v.                        )   CIVIL ACTION NO. 09-G-0880-NE
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
         Defendant.            )

**MEMORANDUM OPINION**

The plaintiff, Debra K. Frakes, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether she has a severe impairment;

    (3)    whether her impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform her past work; and

> (5) whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the instant case, the ALJ, Patrick R. Digby, determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment.  The ALJ found the plaintiff unable to perform her past relevant work.  Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, at 1559.  When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids).  Foote, at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids.  Foote, at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony.  Foote, at 1559.

## THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

As the Sixth Circuit has noted:  "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians

employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." McGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991). In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight ...." McGregor, 786 F.2d at 1053. If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true. McGregor, 786 F.2d at 1053; Elam, 921 F.2d at 1216. The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence. See McGregor, 786 F.2d at 1054; cf. Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## DISCUSSION

In the present case the plaintiff alleges she is disabled primarily because of her bipolar disorder. The plaintiff was involuntarily admitted to Huntsville Hospital on July 11, 2006, for bipolar disorder with psychotic features. The plaintiff had deteriorated following her mother's death in April 2006 and had become increasingly delusional. On July 14 the plaintiff was transferred to the North Alabama Regional Hospital. She was discharged on August 2, 2006. While at North Alabama Regional Hospital, she was treated by a psychiatrist, Dr. Davis, who continued to treat her following her discharge.

The treating notes from Dr. Davis show that the plaintiff was seen on September 20, 2006, reporting increased agitation secondary to Abilify (a medication used to treat depression).  Record 400.  On October 18, 2006, Dr. Davis noted the plaintiff's mood was "great/good."  He commented that the plaintiff was "[m]uch better – not as sad."  Dr. Davis noted the plaintiff was "[n]ot thinking/obsessing [about her mother's] death."  Record 455.  The plaintiff requested to discontinue taking Depakote because of weight gain, and it was discontinued by Dr. Davis.  On November 30, 2006, Dr. Davis again noted the plaintiff complained that Abilify was causing anxiety and jitteriness.  Dr. Davis noted the plaintiff was feeling paranoid and was anxious.  Dr. Davis prescribed Klonopin.  Record 454.

The next treatment note from Dr. Davis is April 26, 2007, when the plaintiff's mood was noted to be "pretty good."  Dr. Davis noted the plaintiff is better after discontinuing Abilify and she was less agitated.  Dr. Davis noted that she had done well on a trip to Indiana.  However, he noted the plaintiff related that she became "a little down" two to three times per week for about half a day.  Dr. Davis also noted the plaintiff was "still anxious" about driving or "getting out" and she still had agoraphobia.  Dr. Davis increased plaintiff's Klonopin dosage.  Record 451.

On June 4, 2007, Dr. Davis noted the plaintiff had improved taking Xanax, but she still had some depression.  She was noted to have an "un psychical reaction to anxiety" and her medications were adjusted.  Record 452.  On July 10, 2007, Dr. Davis noted the plaintiff's mood was better, but she still had anxiety.  The plaintiff reported that

5

she was "not as depressed." Dr. Davis noted that the plaintiff still complained of panic when out socially. His note states: "Agoraphobia is <u>still disabling</u>." Record 451(emphasis added). On August 21, 2007, the plaintiff's mood was noted to be good, but Dr. Davis indicated she had "some crowd anxiety." The plaintiff reported that she was doing better with the Seroquel. It was noted that she was "still not doing a lot" due to "social anxiety," but that she was getting better. Record 450.

The plaintiff saw Dr. Davis on October 10, 2007. Her mood was noted to be "fair to good" and her affect was "fair." The plaintiff was noted to be angry with some irritability. Record 449. On December 10 2007, Dr. Davis noted the plaintiff had some mood swings. Dr. Davis noted the plaintiff was sleeping too much – 11 to 12 hours per day. The plaintiff still had anxiety regarding driving. Record 448.

The next treatment note is June 3, 2008. Dr. Davis indicated the plaintiff was depressed, and also noted the plaintiff was sleeping erratically. He noted the plaintiff was taking her Lamictal off and on.[1] Record 447. On August 5, 2008, Dr. Davis noted the plaintiff "went manic while on [a] cruise." The episode lasted approximately five days. After she returned from the cruise, she had a mild paranoia. The plaintiff's Lamictal was increased. This is the last treatment note from Dr. Davis in the record.

Dr. Davis submitted a medical source opinion dated October 1, 2008, indicating marked and extreme limitations in several areas due to mood swings. Record

---

[1] LAMICTAL is used for the long-term treatment of bipolar disorder to lengthen the time between mood episodes.

480-481.  Dr. Davis commented that the plaintiff "is unable to maintain a stable work history secondary to mood swings due to bipolar disorder."  Dr. Davis indicated on the form that it was completed primarily based upon the plaintiff's subjective complaints.  Record 481.

One of the areas in which Dr. Davis indicated the plaintiff had a marked limitation was in her ability to "[m]aintain attention, concentration or pace for periods of at least two hours."  Record 481.  At the plaintiff's ALJ hearing, the vocational expert testified that the inability to maintain attention, concentration, or pace for periods of at least two hours "would preclude the occupations that I have listed and all occupations in the regional and national economy."  Record 52.  Therefore, if the medical source opinion of Dr. Davis was not properly discredited by the ALJ, the Commissioner failed to carry his burden at step five of showing that the plaintiff can perform other jobs.

The ALJ articulated essentially two reasons for refusing to credit the medical source opinion of Dr. Davis.  First, the ALJ found Dr. Davis's medical source opinion to be "inconsistent with other medical evidence of record, as well as his earlier determination.  Upon the claimant's discharge from hospitalization on 8/2/2006, in improved and stable conditions [sic]."  Record 17.  His "earlier determination" refers to Dr. Davis's assessment of a GAF score of 67 when the plaintiff was discharged from hospitalization.  Record 383.  The ALJ unreasonably, and contrary to the evidence, concluded that the plaintiff's condition remained static from August 2006 until October 2008 when Dr. Davis rendered his medical source opinion.  The treatment notes of Dr.

Davis summarized above show that the plaintiff's condition was quite variable during that period of time. Doctor Davis added panic disorder with agoraphobia as a diagnosis for the first time on April 6, 2007. Record 453. In fact, Dr. Davis opined July 10, 2007, that the plaintiff's "[a]goraphobia is still disabling." Record 451. This shows that the plaintiff's condition had changed dramatically after August 2006.

The treatment records show that the plaintiff received continued treatment by a psychiatrist for over two years. During that time her various symptoms (including anxiety, panic, agoraphobia, depression and mood swings) waxed and waned. Dr. Davis almost continually adjusted her medications to deal with these changes in symptoms. Therefore, it was unreasonable for the ALJ to reject Dr. Davis's medical source opinion because it differed from his assessment in August 2006.

The second concrete reason given by the ALJ for refusing to credit Dr. Davis was as follows: "It does not go unnoticed that 'mood swings' are not seen in these very conservative treatment notes." Record 17-18. This statement by the ALJ has no basis in the record. As already noted, the plaintiff's symptoms included waxing and waning depression and anxiety. While the plaintiff may not have suffered mood swings of such severity as to require hospitalization, the treatment notes of Dr. Davis can in no way be described as showing "very conservative treatment." The treatment notes are replete with prescription of numerous medications, many of which caused harmful side effects. For example:

- Depakote caused weight gain. Record 455.

- Abilify caused anxiety. Record 454.
- The treatment note indicates the plaintiff was doing better with Seroquel, but it was noted there was a fear of falling at night. Record 450.

The remainder of the ALJ's credibility finding as to Dr. Davis's medical source opinion amounts to little more than the ALJ selectively commenting upon isolated notations in the treatment notes that he believed showed plaintiff's condition was not as serious as alleged. For example, the ALJ commented that on April 26, 2007, the plaintiff's "presentation was 'normal,' dress was 'normal' as well as speech." Record 17. The ALJ, however, omits the following notation: "Still anxious – about driving or getting out [positive for] agoraphobia." Record 453. The treatment notes, when taken as a whole, do not support a finding the the plaintiff's mental status was "normal." That her speech, presentation and dress were noted to be normal on one or more occasions would not lead a reasonable fact finder to conclude that her mental condition was not serious.

In summary, the ALJ's recited reasons for rejecting Dr. Davis's medical source opinion from October 2008 are not supported by substantial evidence. Accordingly, under the law of this Circuit, Dr. Davis's medical source opinion must be accepted as true.

The plaintiff last met the insured status requirements of the Social Security Act on September 30, 2007. Although Dr. Davis's medical source opinion was completed on October 1, 2008, the medical evidence of record does not show the plaintiff's mental impairment had significantly worsened after September 30, 2007. Moreover, in his medical source opinion of October 2008, Dr. Davis stated the plaintiff

"is unable to maintain a stable work history." This strongly implies that Dr. Davis's assessment was based upon a longitudinal assessment of the plaintiff's condition, and not upon a recent worsening of her condition. In fact, on July 10, 2007, Dr. Davis stated in his treatment note that the plaintiff's agoraphobia was "still disabling." R 451. This removes any doubt as to whether the plaintiff's treating psychiatrist believed she suffered from disabling symptoms prior to her date of last insured status.

## CONCLUSION

The ALJ's articulated reasons for refusing to credit the medical source opinion of the plaintiff's long-term treating psychiatrist, Dr. Davis, are not supported by substantial evidence. Accordingly, the opinions of Dr. Davis must be accepted as true. The vocational expert testified that an individual with the limitations outlined in Dr. Davis's medical source opinion would be precluded from all work. Although the medical source opinion was given after the plaintiff's date of last insured status, there is no substantial evidence in the record to conclude that her condition had significantly worsened after September 30, 2007. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order will be entered contemporaneously herewith.

DONE and ORDERED 16 December 2009.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.